**MUSICK, PEELER & GARRETT LLP**
333 South Hope Street, Suite 2900
Los Angeles, California 90071-3048
Telephone (213) 629-7600
Facsimile (213) 624-1376

Michael F. Klein (State Bar No. 166011)
m.klein@musickpeeler.com
Daniel J. Taylor (State Bar No. 241404)
d.taylor@musickpeeler.com

Attorneys for PAUL HUYGENS, as Trustee for the TB 42 Trust dated 11/13/2023; and PETER KRAVITZ, as Trustee for the Kravitz Asset Protection Trust

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| PAUL HUYGENS, as Trustee for the TB 42 Trust dated 11/13/2023; and PETER KRAVITZ, as Trustee for the Kravitz Asset Protection Trust,<br><br>Plaintiffs,<br><br>v.<br><br>WESTWOOD WEALTH MANAGEMENT, a California Corporation; WESTWOOD ALPHA OPPORTUNITY FUND, LP, a Delaware Limited Partnership; MICHAEL PURYEAR, an individual; CRAIG ROWEN, an individual, and LPL FINANCIAL LLC, a Delaware Limited Liability Company,<br><br>Defendants. | Case No. 2:26−cv−03241 SB (AJRx)<br><br>Assigned to Hon. Stanley Blumenfeld, Jr.<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND TO STRIKE; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date: September 11, 2026<br>Time: 8:30 a.m.<br>Courtroom: 6C |

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION .......... 6

II. MATERIAL ALLEGATIONS .......... 7

A. Defendants Misrepresented the Westwood Alpha Opportunity Fund .......... 7

1. Defendants Concealed the Fund's Risk .......... 9

2. By the Time Plaintiffs Learned the Truth, It Was Too Late .......... 10

III. PLAINTIFFS SUFFICIENTLY STATED THEIR CLAIMS. .......... 11

A. Legal Standard for Motion to Dismiss for Failure to State a Claim .......... 11

B. Plaintiffs Adequately Plead Their Rule 10b-5 Claim. .......... 12

1. The Elements of a Rule 10b-5 Claim .......... 12

2. The FAC Alleges Material Misrepresentations. .......... 12

(a) The Misrepresentations are Material, Not Puffery .......... 12

(b) The FAC Adequately Pleads False Statements. .......... 14

(c) The FAC Alleges Material Omissions. .......... 17

3. The FAC Adequately Pleads Scienter. .......... 18

4. Disclaimer Language Cannot Defeat Reliance at this Stage .......... 20

C. The Fraud Claims are Adequately Pled .......... 22

D. The Fiduciary Duty Claim Against Puryear is Adequately Pled. .......... 22

IV. THE COURT RETAINS SUBJECT MATTER JURISDICTION. .......... 23

V. THE COURT SHOULD DENY THE MOTION TO STRIKE. .......... 24

VI. CONCLUSION .......... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amgine Techs. (US), Inc. v. Miller*,
2021 WL 5564688 (Del. Ch. Nov. 29, 2021) .... 23

*Beverly Oaks Physicians Surgical Ctr., LLC v. Blue Cross and Blue Shield of Illinois*,
983 F.3d 435 (9th Cir. 2020) .... 20

*Ctr. for Healthcare Educ. & Research, Inc. v. Intl. Cong. for Jt. Reconstruction, Inc.*,
272 Cal. Rptr. 3d 108 (Cal. App. 4th Dist. 2020) .... 22

*Dias v. Nationwide Life Ins. Co.*,
700 F. Supp. 2d 1204 (E.D. Cal. 2010) .... 21

*Emergent Capital Inv. Mgt., LLC v. Stonepath Group, Inc.*,
343 F.3d 189 (2d Cir. 2003) .... 21

*Est. of Eller v. Bartron*,
31 A.3d 895 (Del. 2011) .... 22

*In re Fastly, Inc. Securities Litig.*,
801 F. Supp. 3d 880 (N.D. Cal. 2025) .... 17

*In re Quest Diagnostics ERISA Litig.*,
179 F.4th 217 (3d Cir. 2026) .... 15, 16

*In re Trade Desk, Inc., Securities Litig.*,
824 F. Supp. 3d 1056 (C.D. Cal. 2026) .... 18

*In re Vivendi, S.A. Securities Litig.*,
838 F.3d 223 (2d Cir. 2016) .... 14

*In re Washington Mut., Inc. Securities, Derivative & ERISA Litig.*,
694 F. Supp. 2d 1192 (W.D. Wash. 2009) .... 12

*Glazer Capital Mgt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) .... 11, 12, 14, 18

*Kyung Cho v. UCBH Holdings, Inc.*,
890 F. Supp. 2d 1190 (N.D. Cal. 2012)........19

*Leo Invs. Hong Kong Ltd. v. Tomales Bay Cap. Anduril III, L.P.*,
342 A.3d 1166 (Del. Ch. 2025)........22, 23

*Lovesy v. Armed Forces Ben. Ass'n*,
2008 WL 696991 (N.D. Cal. Mar. 13, 2008)........24

*Ludvik Electric Co. v. Vanderlande Industries, Inc.*,
2023 WL 8789379 (D. Utah Dec. 19, 2023)........21

*Milliner v. Bock Evans Fin. Counsel, Ltd.*,
114 F. Supp. 3d 871 (N.D. Cal. 2015)........22

*Mulligan v. Impax Laboratories, Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014)........13

*Rissman v. Rissman*,
213 F.3d 381 (7th Cir. 2000)........21

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)........14

*Rosenberg Bros. & Co. v. Arnold*,
283 F.2d 406 (9th Cir. 1960)........11

*ScripsAmerica, Inc. v. Ironridge Glob. LLC*,
119 F. Supp. 3d 1213 (C.D. Cal. 2015)........20

*SEB Inv. Mgt. AB v. Align Tech., Inc.*,
485 F. Supp. 3d 1113 (N.D. Cal. 2020)........16

*SEC v. Criterion Wealth Mgt. Services, Inc.*,
599 F. Supp. 3d 932 (C.D. Cal. 2022)........22

*SEC v. Murphy*,
50 F.4th 832 (9th Cir. 2022)........12

*SEC v. Sztrom*,
538 F. Supp. 3d 1050 (S.D. Cal. 2021)........22

*Sliger v. Prospect Mortg., LLC*,
789 F. Supp. 2d 1212 (E.D. Cal. 2011)........24

*Sonora Diamond Corp. v. Superior Ct.*,
83 Cal. App. 4th 523 (2000) ........ 24

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007) ........ 18

*Typenex Co-Inv., LLC v. Solar Wind Energy Tower, Inc.*,
123 F. Supp. 3d 1017 (N.D. Ill. 2015) ........ 21

*United States v. Ritchie*,
342 F.3d 903 (9th Cir. 2003) ........ 20

**Statutes**

17 C.F. R. § 240.10b-5 ........ *passim*

28 U.S.C. §§ 1331, 1367(a) ........ 23

28 U.S.C. § 1332 ........ 23

Fed. R. Civ. P. 9 ........ 11, 23

Fed. R. Civ. P. 12 ........ 23, 24

**Other Authorities**

Black's Law Dictionary (12th ed. 2024) ........ 15

## I. INTRODUCTION

Plaintiffs Paul Huygens, as Trustee for the TB 42 Trust dated 11/13/2023 ("Huygens"), and Peter Kravitz, as Trustee for the Kravitz Asset Protection Trust ("Kravitz") (collectively, "Plaintiffs"), oppose the motion to dismiss and motion to strike filed by Defendants Westwood Wealth Management ("WW"), Westwood Alpha Opportunity Fund, LP (the "Fund"), and Michael Puryear ("Puryear") (collectively, "Defendants").

Plaintiffs' First Amended Complaint ("FAC") pleads a straightforward fraud and fiduciary-duty case with particularity. Contrary to Defendants' position, this is not about a failed investment. It is about Defendants soliciting Plaintiffs to invest $2 million in a private fund by representing that the Fund would mitigate downside risk, monitor risk exposure, maintain a liquidity bias, hedge risk, and pursue risk-adjusted or absolute returns, while concealing that Defendants had already adopted—or intended to adopt—an extreme options strategy with approximately $30 million in notional exposure against only $5.4 million in capital. That undisclosed strategy exposed the Fund to losses exceeding its entire capital base. The FAC identifies the specific statements, who made or approved them, why they were misleading when made, why they mattered to reasonable investors, and how Plaintiffs relied on them in deciding to invest.

The FAC further pleads that Defendants concealed the truth after Plaintiffs invested. The LPA required audited financial statements, and Plaintiffs repeatedly requested them. Yet Defendants withheld the 2023 Audit for nearly twenty months, even though it had been completed two days after Plaintiffs first requested it. During that period, Puryear repeatedly offered false excuses and promises, while Defendants provided limited quarterly summaries that omitted the Fund's actual strategy and then stopped providing financial information altogether. When Plaintiffs finally received the 2023 Audit and Q4 2024 summary after a formal demand, the documents revealed both the undisclosed strategy and the resulting

collapse: the Fund had declined from approximately $13.6 million to $576,000 in four months, and Plaintiffs' investments had been effectively destroyed before they could exercise meaningful redemption rights.

Defendants' motion asks the Court to disregard those allegations, accept Defendants' competing interpretation of disputed offering documents, and resolve fact-bound issues of materiality, falsity, scienter, reliance, fiduciary duty, jurisdiction, and alter ego liability at the pleading stage. That is not the Rule 12 standard. Plaintiffs' allegations, accepted as true and viewed holistically, state claims for securities fraud, fraudulent misrepresentation, fraudulent concealment, breach of fiduciary duty, and related relief. Defendants' motion to strike likewise fails because the challenged allegations concerning the Pitch Deck, concealment, and alter ego liability are central to Plaintiffs' claims and cannot be deemed immaterial or prejudicial as a matter of law. The motions should be denied in their entirety or, at minimum, Plaintiffs should be granted leave to amend.

## II. MATERIAL ALLEGATIONS

### A. Defendants Misrepresented the Westwood Alpha Opportunity Fund

The FAC alleges that Defendant Puryear was Plaintiffs' registered and trusted investment adviser through WW. FAC ¶¶ 25-26. In 2023, he solicited Plaintiffs to invest in his own separate, privately managed hedge fund, the Westwood Alpha Opportunity Fund ("Fund"). FAC ¶¶ 1, 26. Puryear was the Founder, Portfolio Manager, managing member, President, CEO, and Chief Compliance Officer of WW. FAC ¶¶ 10, 26. Defendants discussed the Fund with Plaintiffs and sent them marketing materials, including the Westwood Alpha Opportunity Fund Presentation ("Pitch Deck") and an Offering Memorandum ("OM"), which made the following representations about the Fund's strategy (the "Statements"):

1) The Fund "aims to mitigate downside risk";
2) The "portfolio allows for efficient monitoring of risk exposure";

3) It offers "risk-adjusted returns" and a strategy to "hedge risk";

4) It has the "liquidity bias … we need to manage positions … while effectively managing risk"; and

5) It is an "absolute return fund," which Plaintiffs allege means the Fund would seek more stable growth over long periods instead of quick gains. FAC ¶¶ 28, 98.

Contrary to Defendants' representations, Defendants had already engaged in, or intended to engage in, a massively risky options strategy, with a notional value of approximately $30 million against only $5.4 million in capital, and Plaintiffs allege that timely disclosure of that information would have revealed a leverage ratio of approximately 5.5 to 1. FAC ¶¶ 33, 62-63. This exceptionally risky strategy exposed the Fund to losses exceeding its entire capital base. FAC ¶¶ 54-55, 82. Had Plaintiffs known the Fund's true risk profile and Defendants' misrepresentations and concealments, they would not have invested in the Fund. FAC ¶¶ 35, 88-89, 102-104.

Defendants knew the Fund would use this strategy because Puryear was the Fund's Portfolio Manager and Defendants allegedly knew of the Fund's high-risk strategy while making contrary representations to induce Plaintiffs' investment. FAC ¶¶ 10, 34, 56, 82-85. Thus, they knew their representations falsely described the Fund's investment strategy when they made them. FAC ¶¶ 34, 54-55, 78-79, 82-84. Defendants also hid the Fund's true strategy from Plaintiffs even though Puryear had been Plaintiffs' financial advisor. FAC ¶¶ 25-26, 34, 60.

Based on Defendants' representations and their trust in their investment adviser, Plaintiffs agreed to invest in the Fund. FAC ¶¶ 26-28, 35, 88-89, 103, 127. By January 2024, Plaintiffs signed a Limited Partner Agreement ("LPA"), with WW as the General Partner, investing $1.0M each. FAC ¶¶ 7, 35. Puryear failed to disclose his "direct and substantial financial interest" in the Fund. FAC ¶¶ 27, 127. Plaintiffs also allege they maintained advisory accounts governed by an Advisory

Agreement with WW and Puryear through the LPL platform, which permitted asset-based fees to be withdrawn only with client authorization, quarterly. FAC ¶¶ 65-67.

**1. <u>Defendants Concealed the Fund's Risk</u>**

The LPA required WW to "furnish to each Partner" the annual audited financials "as soon as is reasonably practicable after the close of each Fiscal Year." FAC ¶ 36. It also allowed Plaintiffs the right to withdraw up to 25% of their capital each quarter with 90 days' written notice. FAC ¶ 37. Plaintiffs "relied on Defendants… to provide timely financial statements" so they could "make informed decisions regarding their right of redemption." FAC ¶ 37. Plaintiffs allege that, if they had learned of the Fund's extreme leverage through timely disclosure, they would have immediately exercised their contractual redemption rights to mitigate their exposure and redeem their contributions from the Fund. FAC ¶¶ 62-63.

In February 2024, Huygens asked Puryear to send him the Fund's financial statements. FAC ¶ 39. Puryear responded that he would send them when he received them. FAC ¶ 39. Two days later, Defendants received the 2023 annual audited financials ("2023 Audit"). FAC ¶ 40. Despite Puryear's promise to send this Audit, Defendants intentionally withheld it from Plaintiffs until nearly twenty months later. FAC ¶¶ 41, 49, 52-53. Throughout 2024 and 2025, Plaintiffs repeatedly asked Defendants to provide financial statements and updates on the Fund. FAC ¶¶ 44-45, 136. Defendants responded with false statements on why they could not provide them or false promises as to when they would, even though they had no intention of doing so. FAC ¶¶ 38, 41, 44, 46-49, 60, 137.

Defendants promised in the OM that they would provide quarterly summaries to Plaintiffs. FAC ¶ 30. While they withheld the 2023 Audit, Defendants provided quarterly summaries for the first and second quarters of 2024. FAC ¶¶ 42-43. The summaries showed the value of Plaintiffs' investments, including an approximately 45 percent increase by the second quarter of 2024, but they did not provide any details on the Fund's investment strategy. FAC ¶¶ 42-43. After that, Defendants

stopped providing financial documents, including the third and fourth quarter 2024 statements, the 2023 and 2024 audited financial statements, and financials for 2025. FAC ¶ 50. Plaintiffs continued to ask Defendants for updates and these financials. FAC ¶¶ 44-45. Mr. Puryear repeatedly claimed he could not provide them because they had a "new fund administrator" or that he would be sending them "shortly." FAC ¶¶ 46-47. Plaintiffs trusted Mr. Puryear's representations as they had worked with him as their investment adviser. FAC ¶¶ 25-27, 88, 127. But his excuses were false: he did not provide those financials for over a year, even though Defendants had the 2023 Audit two days after Plaintiffs' first request. FAC ¶¶ 40-41, 46-49, 52-53.

**2. <u>By the Time Plaintiffs Learned the Truth, It Was Too Late</u>**

Eventually, Plaintiffs sent Defendants a formal demand for these financials and invoked their 25% redemption right. FAC ¶¶ 37, 51. Within two days, WW provided the 2023 Audit and the Q4 2024 quarterly summary. FAC ¶ 52. Defendants promised to send the 2024 audit once it was completed but had not provided it as alleged in the FAC. FAC ¶¶ 50, 52, 145.

Plaintiffs' review of the financials revealed three alarming facts. First, Defendants had the 2023 Audit shortly after Plaintiffs asked for it, meaning Defendants intentionally withheld it for more than a year despite claiming they could not provide it and even when the Fund's Q2 2024 summary reflected an increase in Plaintiffs' investments. FAC ¶¶ 39-43, 49, 51-53, 60. Second, the 2023 Audit revealed to Plaintiffs, for the first time, the Fund's extreme options strategy. FAC ¶¶ 54-55. Plaintiffs allege that Defendants repeatedly made and lost large options bets and did not adjust the strategy despite severe losses. FAC ¶¶ 56-58. Such actions contradicted Defendants' representations that they would monitor for and hedge against risk. FAC ¶¶ 28, 31, 54-55, 63, 83. Finally, the financials revealed the expected outcome of this strategy: Plaintiffs' investment was lost. FAC ¶¶ 57-58. Between June 30, 2024 and October 31, 2024, the Fund declined 96% from

approximately $13.6 million to approximately $576,000. FAC ¶ 57. Mr. Huygens' capital account value dropped more than 98% in two quarters, from $1,454,218 at the end of Q2 2024 to $18,992.76 at the end of Q4 2024. FAC ¶ 58. Mr. Kravitz suffered similar losses. FAC ¶ 58.

Defendants intentionally withheld these financials to avoid revealing their investment strategy and the eventual losses that followed. FAC ¶¶ 59-61. As a result, Defendants prevented Plaintiffs from exercising their redemption rights before the Fund collapsed. FAC ¶¶ 61-63, 91-92, 104, 112-114, 146, 152-159. Plaintiffs specifically allege that, had they timely received the 2023 Audit and discovered the Fund's extreme leverage, they would have immediately exercised their redemption rights to mitigate their exposure and redeem their contributions. FAC ¶¶ 62-63. Defendants' concealment also ensured that Plaintiffs did not end their relationship with Defendants sooner while Defendants continued to benefit from Plaintiffs' participation in the Fund and related advisory relationship. FAC ¶¶ 27, 60-61, 65-70.

## III. <u>PLAINTIFFS SUFFICIENTLY STATED THEIR CLAIMS.</u>

### A. <u>Legal Standard for Motion to Dismiss for Failure to State a Claim</u>

Under Rule 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Glazer Capital Mgt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 763 (9th Cir. 2023) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A plaintiff cannot rely on "labels and conclusions" or "naked assertions." *Id.* But the court must view the allegations "in the light most favorable to Plaintiffs." *Id.* Fed. R. Civ. 9(b) requires fraud claims to "state with particularity the circumstances constituting fraud." If the Court dismisses any claim, it should grant leave to amend unless amendment would be futile. *See Rosenberg Bros. & Co. v. Arnold*, 283 F.2d 406, 406 (9th Cir. 1960) (requiring

"extreme liberality" in favor of amendments).

**B. Plaintiffs Adequately Plead Their Rule 10b-5 Claim.**

**1. The Elements of a Rule 10b-5 Claim**

A securities fraud claim under Section 10(b) and Rule 10b-5 of the Securities Exchange Act requires: "(1) a material misrepresentation or omission by the defendant [('falsity')]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Glazer*, 63 F.4th at 764. Defendants do not contest the third, fifth, or sixth elements, so Plaintiffs address only falsity, scienter, and reliance.

**2. The FAC Alleges Material Misrepresentations.**

**(a) The Misrepresentations are Material, Not Puffery.**

A statement is material if, under all the circumstances, it would have assumed actual significance in the deliberations of a reasonable investor. *SEC v. Murphy*, 50 F.4th 832, 846–47 (9th Cir. 2022). It must only be significant; it need not actually change the investor's plan to be considered material. *Id.* The FAC alleges material misrepresentations that the Fund would: (1) aim to "mitigate downside risk"; (2) allow for "monitoring of risk exposure"; (3) offer "risk-adjusted returns" and "hedge risk"; (4) maintain a "liquidity bias … while effectively managing risk"; and (5) operate as an "absolute return fund." FAC ¶¶ 28, 31, 78-80.

Such statements about a fund's risk profile and investment approach would have been significant to a reasonable investor, and the FAC alleges that these statements were material to Plaintiffs. FAC ¶¶ 78-80. Further, courts have held that statements about risk management are material when a defendant allegedly takes undisclosed risky actions that contradict prior representations. *In re Washington Mut., Inc. Securities, Derivative & ERISA Litig.*, 694 F. Supp. 2d 1192, 1208–09 (W.D. Wash. 2009). There, the court held that allegations concerning a bank's risk-management standards were sufficient where the plaintiff also alleged that the bank

had weakened those standards.

Here, Plaintiffs allege that Defendants said they would "mitigate downside risk" while concealing that they used a massively risky options strategy, with a notional value of approximately $30 million against only $5.4 million in capital that exposed the Fund to losses in excess of its entire capital base. FAC ¶¶ 33, 54-55, 79. As such, Defendants' representations were material because they concerned why the Fund ultimately failed: its undisclosed, extremely risky investments. Under *Washington Mutual*, Defendants' representation that the Fund would allow "monitoring of risk exposure" was likewise material because the FAC alleges that Defendants failed to monitor or adjust for that risk. FAC ¶¶ 28, 56-57, 78.

Defendants argue that the Statements are puffery because they are "not capable of objective verification, and lack[] a standard against which a reasonable investor could expect them to be pegged." *Mulligan v. Impax Laboratories, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014) (citation omitted). But they are not puffery; "there is a difference between enthusiastic statements amounting to general puffery and opinion-based statements that are anchored in misrepresentations of existing facts." *Id.* (citation omitted). That determination "entail[s] fact-intensive assessments that are more properly left to the jury." *Id.* (citation omitted). A court also may not assess challenged statements "in a vacuum, plucking the statements out of their context…, but rather will examine the entire statement and its circumstances to determine if it is actionable." *Id.* (citation omitted). At the pleading stage, statements should not be deemed puffery unless they are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Id.* at 966-67 (citation omitted).

The alleged Statements are misrepresentations of fact about the Fund's actual strategy. Taken together, they misled Plaintiffs about the nature of the Fund's risk profile. That risk profile was not immaterial puffery; it was a core fact on which reasonable investors would base investment decisions. Defendants also argue that

statements about "liquidity bias" and "absolute return fund" are vague anticipatory statements actionable only if Plaintiffs allege that Defendants did not believe them. Plaintiffs did allege such facts: Defendants failed to disclose that they had chosen a high-risk options strategy exposing the Fund to losses exceeding its entire capital base. FAC ¶¶ 33, 54-55, 79. Those allegations show that Defendants knew the Fund's strategy and knowingly made false representations about it while concealing the truth.

Defendants also ignore the aggregate effect of the representations. The FAC alleges that Defendants used those representations to distinguish the Fund from highly leveraged speculative trading and to induce Plaintiffs to invest, even though the Fund allegedly was highly speculative. *See In re Vivendi, S.A. Securities Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (finding defendant could not "escape liability for securities fraud" by making many slightly false representations "all collectively aimed at perpetuating a broader, material lie").

Thus, Plaintiffs allege that Defendants' Statements were concrete representations about the Fund's investment methodology. They are not generic statements of corporate optimism that Defendants can dismiss as "puffery"; they describe how the Fund would be managed, and Plaintiffs allege those descriptions were false.

**(b) The FAC Adequately Pleads False Statements.**

Next, a plaintiff must plead "why or how" each statement is false. *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). A plaintiff meets the particularity requirement of pleading falsity if a reasonable inference indicates the statements are false. *Glazer*, 63 F.4th at 766 (citing *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 315-18 (2007)). Plaintiffs have met this standard. The FAC alleges that Defendants represented they would "mitigate downside risk" and "hedge risk" when they had already deployed "a massively risky options strategy, with a notional value of approximately $30 million against only $5.4 million in capital," which "exposed

the Fund to losses in excess of its entire capital base." FAC ¶¶ 33-34, 54-55, 79, 83.

Defendants argue that "mitigate downside risk" is false only if they "sought out" downside risk, but that is not what "mitigate" means. Mitigate means "to make less severe or intense." "Mitigate," Black's Law Dictionary (12th ed. 2024). As alleged, Defendants knew their strategy increased the severity of the downside risk because it "exposed the Fund to losses in excess of its entire capital base" and they did not mitigate against that risk. FAC ¶¶ 33-34, 54-57, 79, 83-84.

Defendants also argue that the FAC fails to allege they did not hedge risk. But "hedge" means using two transactions "to ensure a position of breaking even… [and] to safeguard oneself from loss[.]" "Hedge," Black's Law Dictionary (12th ed. 2024). Again, the FAC alleges that Defendants' strategy did not attempt to hedge or safeguard from losses; rather, it exposed the Fund to losses exceeding its entire capital base. FAC ¶¶ 31, 33-34, 54-57, 79, 83-84.

The FAC also alleges that Defendants said they would "monitor[] the risk exposure," but had no intention of doing so because they "repeatedly made, and lost, large option bets on the same investments" and yet "did not *adjust* [this] strategy" even though they "consistently los[t] on these bets over multiple months across hundreds of transactions," causing the Fund to "decline [by] approximately 96% in just four months." FAC ¶¶ 28, 56-57, 78.

Defendants claim the FAC is silent on risk monitoring. It is not. Even Defendants' own case recognizes that short-term underperformance may support liability if a defendant failed to "analyze[] that underperformance and evaluates the fund's underlying strategy" and the losses were "severe and sustained enough[.]" *In re Quest Diagnostics ERISA Litig.*, 179 F.4th 217, 226 (3d Cir. 2026).

Defendants next argue that "liquidity bias" means only a general inclination, with no requirement that the Fund actually maintain liquidity. That reading isolates "bias" from "liquidity." Plaintiffs' interpretation is more reasonable: the phrase represented an inclination toward liquidity over illiquidity. As alleged, Defendants'

strategy lacked any such bias because it "exposed the Fund to losses exceeding its entire capital base." Defendants also claim the FAC alleges $8 million in available liquidity. But that figure comes from subtracting the $5.4 million of assets used in 2023 from the $13.4 million in assets the Fund had more than six months later in July 2024. *Compare* FAC ¶ 54 *with id.* ¶ 57. In any event, the FAC alleges that the Fund's entire asset base was exposed, making the strategy inconsistent with a liquidity bias.

Defendants next interpret "absolute return fund" to include short-term growth, citing *Quest*, 179 F.4th at 226. But *Quest* does not interpret that phrase. Defendants instead make a factual argument that contradicts the FAC's allegations: an "absolute return fund" "seeks more stable growth over long periods" and "uses hedging and risk-management strategies." FAC ¶¶ 28, 98. Defendants admit the FAC alleges "short-term substantial losses." And as discussed, the FAC alleges that Defendants did not use hedging and risk-management strategies. Defendants also claim that the Pitch Deck represented a short-term strategy, but the document says only that Defendants would do so to "establish[] a base case." Johnston Decl., Ex. A at 3. Resolving factual disputes about the Pitch Deck, a document outside the pleadings, is not appropriate at this stage. Plaintiffs' allegations must be accepted as true.

Defendants' competing interpretations of these Statements rest on unsupported factual premises, including that a high-risk portfolio can still be a risk-managed portfolio, that risk can be hedged in many ways, and that a liquidity bias need not require actual liquidity. Those arguments ask the Court to adopt Defendants' preferred meaning of disputed statements instead of those alleged by Plaintiffs. But courts cannot resolve "disputes about the actual meaning of the statement in" a motion to dismiss because they "must construe the pleadings in the light most favorable to the nonmoving party." *SEB Inv. Mgt. AB v. Align Tech., Inc.*, 485 F. Supp. 3d 1113, 1132 (N.D. Cal. 2020) (citation omitted).

The FAC pleads why each Statement was false and, therefore, has adequately

pled its claims. The Court should not resolve factual disputes over the meaning of those terms at the pleading stage.

**(c) The FAC Alleges Material Omissions.**

Plaintiffs also allege that Defendants misled them by omitting material information about the Fund's extreme strategy. Defendants failed to disclose that strategy and then lied to keep Plaintiffs from discovering it. Defendants' motion does not meaningfully address this omission theory under Rule 10b-5.

An omission is misleading when "a reasonable investor would have acted differently if… the truth had been disclosed" or it "create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *In re Fastly, Inc. Securities Litig.*, 801 F. Supp. 3d 880, 895 (N.D. Cal. 2025) (citations omitted) (finding sufficient plaintiffs' allegation that defendants omitted material "information that cut against" their affirmative representations).

Here, the FAC alleges that Defendants repeatedly described the Fund's investment strategy, especially as to managing, hedging, and monitoring risk. Even if those statements were true in isolation, they were misleading because Defendants omitted information that would have led Plaintiffs not to invest. The FAC alleges that Defendants intentionally withheld the 2023 Audit, which disclosed their extreme strategy, by falsely claiming they could not provide it—even when the Fund was performing well. FAC ¶¶ 38-49, 52-55, 59-63. The Court can reasonably infer that, if Defendants were willing to conceal contractually required documents to prevent Plaintiffs from learning about their strategy, reasonable investors would not have invested in a Fund using that strategy. The FAC also alleges that the options strategy was "extreme," "massively risky," and "exceptionally risky" because its options exposure reflected a 5.5-to-1 ratio and "exposed the Fund to losses in excess of its entire capital base." FAC ¶¶ 33, 54-55, 63, 82, 92. Defendants' repeated risk-management representations were misleading because they omitted those material facts.

Thus, Plaintiffs adequately allege that Defendants omitted material information about the Fund's extreme strategy. At minimum, materiality is a factual issue that cannot be resolved at the pleading stage.

**3. <u>The FAC Adequately Pleads Scienter.</u>**

Scienter is an "intent to mislead investors or deliberate recklessness to an obvious danger of misleading investors." *Glazer*, 63 F.4th at 765 (quotation omitted). Deliberate recklessness requires alleging "an *extreme* departure from the standards of ordinary care… which presents a danger of misleading buyers… that is either known to the defendant or is so *obvious* that the actor must have been aware of it." *Id.* (quotation omitted; emphasis in original). The plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (quotation omitted). A "strong inference" means it is "*at least as likely as* any plausible opposing inference." *Tellabs*, 551 U.S. at 328 (emphasis in original). It "need not be irrefutable… or even the most plausible of competing inferences[.]" *Id.* at 324 (quotation omitted). The Court must take a "holistic review" of the combined allegations. *Glazer*, 63 F.4th at 766 (citation omitted). Defendants prevail "only if a reasonable person could not draw an inference of scienter from the pleaded facts." *In re Trade Desk, Inc., Securities Litig.*, 824 F. Supp. 3d 1056, 1076 (C.D. Cal. 2026) (citation omitted).

Here, Plaintiffs' allegations more than give rise to an inference at least as likely as any plausible inference that Defendants intended to mislead Plaintiffs or, at minimum, knew of the obvious danger of doing so and proceeded anyway. As the Fund's Portfolio Manager, Puryear "knew of the Fund's high-risk strategy while simultaneously making contrary representations to induce Plaintiffs' investment." FAC ¶ 34. While Defendants "solicited Plaintiffs with promises of a low-risk strategy," the Fund "had already engaged in, or intended to engage in, a massively risky options strategy." FAC ¶¶ 33, 83. As the Fund's manager and principal, "Puryear had the power to direct or cause the direction of the management and

policies of WW and the Fund." FAC ¶ 85. Puryear was also Plaintiffs' "trusted investment advisor." FAC ¶¶ 25-27. Together, those allegations support a strong inference that Defendants knew—or were deliberately reckless in not knowing—that their risk-management representations were misleading. FAC ¶¶ 78-80, 82, 84.

The FAC also supports scienter through Defendants' concealment of the 2023 Audit. Plaintiffs requested the Fund's financial statements in February 2024, and Puryear promised to provide the audited statements when he received them. FAC ¶¶ 36-41. Defendants received the 2023 Audit two days later, yet withheld it from Plaintiffs for nearly twenty months even though they were contractually required to provide it. FAC ¶¶ 36-41, 52-54, 60, 82. Instead, Defendants gave false explanations for the delay. FAC ¶¶ 44-49, 52-53. During the same period, Defendants provided limited quarterly summaries that did not disclose the Fund's strategy. FAC ¶¶ 42-43. And they withheld the 2023 Audit even though the Fund's Q2 2024 summary showed Plaintiffs' investments had increased approximately 45 percent by June 30, 2024. FAC ¶ 43. When Plaintiffs finally received the 2023 Audit, it revealed "for the first time" the Fund's extreme options strategy, which contradicted Defendants' representations. FAC ¶ 54. Defendants' prolonged concealment of a document that revealed their undisclosed strategy supports a strong inference of scienter. *See Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1202 (N.D. Cal. 2012) (finding investors' allegations that defendant delayed providing them with documents that would have revealed his misrepresentations sufficient to support scienter).

Defendants' only response is to argue that the 2023 Audit disclosed nothing new, so withholding it cannot support scienter. But that contradicts the FAC's allegation that the Audit revealed the extreme strategy to Plaintiffs "for the first time." FAC ¶ 54. Defendants also argue they lacked any intent to deceive because other documents supposedly disclosed the Fund's risky strategy. That argument relies on documents outside the FAC and, in any event, those documents did not

disclose the specific strategy alleged here: exposing the Fund's entire capital base to losses through extreme options exposure. If Defendants truly believed they had disclosed the strategy, there would have been no reason to withhold the Audit or give false explanations for not producing it.

The FAC therefore pleads a strong inference of scienter. Defendants have not shown that any competing inference is more plausible, particularly given the allegations that they concealed the Fund's strategy and the Audit for nearly twenty months.

### 4. **<u>Disclaimer Language Cannot Defeat Reliance at this Stage.</u>**

Plaintiffs allege that they relied on Defendants' written and oral representations about the Fund's specific strategy. FAC ¶¶ 35, 88-89. That reliance was reasonable because Puryear had been their "trusted investment adviser." FAC ¶¶ 25-26.

Defendants seek dismissal based on factual disputes and documents outside the FAC. The Court may consider those documents if "the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). The Court should not consider the Subscription Agreement because the FAC never refers to it and it does not form the basis of Plaintiffs' claims. *See Beverly Oaks Physicians Surgical Ctr., LLC v. Blue Cross and Blue Shield of Illinois*, 983 F.3d 435, 439 (9th Cir. 2020) (considering documents outside the pleading if *the document is <u>central</u> to the plaintiff's claim*") (emphasis added). Likewise, although the FAC references the LPA for Plaintiffs' audit and redemption rights, Defendants cannot use the LPA's general disclaimer language outside of the pleadings to defeat Plaintiffs' alleged reliance, particularly where Plaintiffs allege intentional misrepresentations and concealment outside the LPA.

Defendants also rely on distinguishable cases. Plaintiffs' reliance is based on Defendants' written representations, not solely oral statements as in *ScripsAmerica,*

*Inc. v. Ironridge Glob. LLC*, 119 F. Supp. 3d 1213, 1249 (C.D. Cal. 2015), and *Rissman v. Rissman*, 213 F.3d 381, 385 (7th Cir. 2000). Plaintiffs' reliance is also grounded in their longstanding fiduciary relationship with Puryear as their financial adviser, unlike *Emergent Capital Inv. Mgt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 196 (2d Cir. 2003). Defendants further admit that Plaintiffs could rely on the OM's representations but argue those statements are vague, citing *Oregon Pub. Emps. Ret. Fund v. Apollo Group, Inc.*, 774 F.3d 598, 606 (2014). But *Oregon* distinguished phrases like "good," "well-regarded," or other "feel good monikers," which are puffery, from statements capable of objective verification. *Id.* Here, Defendants' OM representations are not feel-good monikers; they are statements about the Fund's investment approach that are capable of objective verification by comparing it to the Fund's actual approach, of which Defendants had full knowledge. Defendants also do not address their omission of the specific strategy they planned to use, which they allegedly went to great lengths to hide from Plaintiffs even after they invested.

In any event, general disclaimers do not immunize intentional fraud. *Ludvik Electric Co. v. Vanderlande Industries, Inc.*, 2023 WL 8789379, at *14 (D. Utah Dec. 19, 2023) ("a non-reliance provision may not insulate [a party] from liability for its own fraud"). And "except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact." *Dias v. Nationwide Life Ins. Co.*, 700 F. Supp. 2d 1204, 1216 (E.D. Cal. 2010); *Typenex Co-Inv., LLC v. Solar Wind Energy Tower, Inc.*, 123 F. Supp. 3d 1017, 1028 (N.D. Ill. 2015) (holding that "it is not clear that the law always gives effect to a no-reliance clause, at least without further factual inquiry that cannot be undertaken at this stage of the litigation"). The Court should not convert disclosure language outside the FAC into a complete defense at the pleading stage, particularly where Plaintiffs allege intentional fraud.

**C. <u>The Fraud Claims are Adequately Pled</u>**

For Count II, Defendants repeat the same arguments they make against the Rule 10b-5 claim. Those arguments fail for the same reasons. Defendants also ignore Plaintiffs' independent concealment allegations. Plaintiffs allege that Defendants intentionally concealed their specific options strategy when soliciting Plaintiffs and continued to conceal it for nearly two years, even when the Fund was performing well. The reasonable inference is that Defendants concealed that strategy to prevent reasonable investors, including Plaintiffs, from declining to invest in such a risky Fund. These allegations independently support Plaintiffs' fraud-based claims.

**D. <u>The Fiduciary Duty Claim Against Puryear is Adequately Pled.</u>**

A breach of fiduciary duty requires "that the defendant owed her a fiduciary duty and that the defendant breached it." *Est. of Eller v. Bartron*, 31 A.3d 895, 897 (Del. 2011). Defendants argue that, because Puryear is "the human controller of the general partner," he owed no duty of care and owed only "a duty of loyalty." *Leo Invs. Hong Kong Ltd. v. Tomales Bay Cap. Anduril III, L.P.*, 342 A.3d 1166, 1196 (Del. Ch. 2025).

But Puryear owed Plaintiffs a duty of care as their investment adviser. *See SEC v. Criterion Wealth Mgt. Services, Inc.*, 599 F. Supp. 3d 932, 948 (C.D. Cal. 2022). That duty includes a duty of care. *See Ctr. for Healthcare Educ. & Research, Inc. v. Intl. Cong. for Jt. Reconstruction, Inc.*, 272 Cal. Rptr. 3d 108, 118 (Cal. App. 4th Dist. 2020) (recognizing "[fiduciaries] with heightened duties of care, such as investment advisors"); *Milliner v. Bock Evans Fin. Counsel, Ltd.*, 114 F. Supp. 3d 871, 882 (N.D. Cal. 2015) (denying investment advisor's motion to dismiss a breach of fiduciary duty claim as plaintiff alleged its failure to manage the investments violated its "standard of care"). Federal law also "imposes a fiduciary duty upon investment advisers to exercise the utmost good faith in dealing with clients, to disclose all material facts to their clients, and to employ reasonable care to avoid

misleading clients." *SEC v. Sztrom*, 538 F. Supp. 3d 1050, 1056 (S.D. Cal. 2021). The FAC alleges that Puryear was Plaintiffs' investment adviser and therefore owed them a duty of care. FAC ¶¶ 25-27, 122, 127. Defendants do not argue that he did not breach that duty. If they did, the FAC alleges otherwise: Puryear failed to disclose the Fund's extremely risky options strategy and intentionally concealed both that strategy and the 2023 Audit to mislead Plaintiffs.

The FAC also pleads loyalty-based allegations. The duty of loyalty requires that a defendant act without any conflicts of interest that would impair its ability to act in the best interest of the plaintiff. *Leo*, 342 A.3d at 1195. Here, Puryear used an existing adviser-client relationship to solicit investments. FAC ¶¶ 3, 25-27, 127. He had personal financial interests in the Fund that he failed to disclose. FAC ¶¶ 27, 127. He also concealed material information to prevent Plaintiffs' withdrawals, preserve Fund assets, and continue receiving advisory and other fees, thereby breaching his duty of loyalty. FAC ¶¶ 32-33, 38-56, 59-61, 128-130, 135-138.

Defendants address only Puryear's failure to disclose his financial interest in the Fund. They argue that allegation fails under Fed. R. Civ. 9(b), but this is a breach of fiduciary duty claim, not a fraud claim. In Delaware, "a breach of fiduciary duty claim, predicated on allegedly fraudulent activity, need only meet Delaware's rather forgiving notice pleading standard." *Amgine Techs. (US), Inc. v. Miller*, 2021 WL 5564688, at *14 (Del. Ch. Nov. 29, 2021) (quotation omitted). Defendants also argue that the OM disclosed Puryear's financial stake by detailing a "performance allocation" and a "management fee." *See* Johnston Decl., Ex. B at 15-17. But those fees were for WW, not Puryear.

## IV. <u>THE COURT RETAINS SUBJECT MATTER JURISDICTION.</u>

The Court has jurisdiction over federal claims and supplemental jurisdiction over related state-law claims. 28 U.S.C. §§ 1331, 1367(a). It has diversity jurisdiction if no plaintiff is a citizen of the same state as any defendant. 28 U.S.C. § 1332. Courts must dismiss a case if they lack subject matter jurisdiction. Fed. R.

Civ. P. 12(b)(1).

Defendants argue that the Court lacks subject matter jurisdiction if it dismisses the Rule 10b-5 claim and finds no diversity jurisdiction. For the reasons discussed above, the Court should not dismiss the Rule 10b-5 claim at the pleading stage. If it does, Plaintiffs request leave to amend the FAC to address any deficiencies.

## V. <u>THE COURT SHOULD DENY THE MOTION TO STRIKE.</u>

Courts "may strike from a pleading … immaterial … matter." Fed. R. Civ. P. 12(f). Matter is "immaterial" if it "has no essential or important relationship to the claim for relief or the defenses being pleaded." *Sliger v. Prospect Mortg., LLC*, 789 F. Supp. 2d 1212, 1216 (E.D. Cal. 2011) (quotation omitted). Courts grant this motion only if "it will make trial less complicated or eliminate serious risks of prejudice to the moving party, delay, or confusion of the issues." *Id.* (citation omitted). Courts "disfavor" motions to strike, and they "will usually be denied[.]" *Id.* (citation omitted). The Court should deny the motion if it doubts "whether the challenged matter may raise an issue of fact or law[.]" *Id.* (citation omitted).

Defendants ask the Court to strike any allegations it finds insufficient if it grants their motion to dismiss, including allegations from the Pitch Deck. But Defendants cite no authority for that position and do not show that the challenged allegations have no possible relation to the controversy or would prejudice them.

Defendants also move to strike the alter ego allegations, claiming they are conclusory. Alter ego liability requires: (1) "such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist," and (2) "an inequitable result if the acts in question are treated as those of the corporation alone." *Sonora Diamond Corp. v. Superior Ct.*, 83 Cal. App. 4th 523, 538 (2000) (citation omitted). A plaintiff must at least allege "some examples of alleged domination[.]" *Lovesy v. Armed Forces Ben. Ass'n*, 2008 WL 696991, at *4 (N.D. Cal. Mar. 13, 2008)

(citation omitted).

Plaintiffs plead more than the legal standard on both elements, including specific examples of domination. "As a controlling officer and manager of WW… Puryear exercised direct control over Defendant WW's" representations, decisions to omit information, assets, and management. FAC ¶¶ 101, 110, 122. "Defendant Puryear was the managing member, President, CEO, and Chief Compliance Officer of Defendant WW." FAC ¶ 10. "Puryear exclusively made decisions for WW without independent director involvement or corporate deliberation." FAC ¶ 15. Puryear "personally directed transactions, executed agreements on WW's behalf without proper authorization, and used the entity as a vehicle to shield himself from liability." FAC ¶ 17. "WW's structural undercapitalization contributed to, and was exacerbated by, Puryear's reckless investment strategy as the Fund lacked any meaningful internal oversight or risk controls." FAC ¶ 14. And "Puryear exercised complete domination and control over WW with respect to its finances, policies, business practices, capitalization, and day-to-day operations." FAC ¶ 13.

The FAC also alleges why treating WW's acts as its alone would be inequitable. "Puryear's abuse of the corporate structure allowed him to wrongfully obtain the benefits of Plaintiffs' participation in the Fund while insulating himself from liability through a shell entity lacking true independence, capitalization, or governance." FAC ¶ 19. And "Puryear caused WW to incur obligations to Plaintiffs knowing WW could not satisfy them." FAC ¶ 18.

Thus, the FAC adequately pleads alter ego liability, and the alter ego allegations should not be stricken.

## VI. CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' motions to dismiss and strike. If the Court grants any part of either motion, Plaintiffs request leave to amend the FAC within seven days to address any deficiencies identified by the Court.

DATED: August 21, 2026

MUSICK, PEELER & GARRETT LLP

By: [signature]

Daniel J. Taylor
Attorneys for PAUL HUYGENS, as Trustee for the TB 42 Trust dated 11/13/2023; and PETER KRAVITZ, as Trustee for the Kravitz Asset Protection Trust

# CERTIFICATE OF COMPLIANCE

The undersigned counsel of record for Plaintiffs certifies that this brief contains 6,467 words, which complies with the word limit of L.R. 11-6.1.

DATED: August 21, 2026

MUSICK, PEELER & GARRETT LLP

By: [signature]
Daniel J. Taylor
Attorneys for PAUL HUYGENS, as Trustee for the TB 42 Trust dated 11/13/2023; and PETER KRAVITZ, as Trustee for the Kravitz Asset Protection Trust